CASE NO. 12-57246

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————

GABRIEL FELIX MORAN

*Plaintiff-Appellant,*

v.

THE SCREENING PROS, LLC

*Defendant-Appellee.*
————————

APPELLEE THE SCREENING PROS, LLC'S REQUEST FOR JUDICIAL
NOTICE IN SUPPORT OF ANSWERING BRIEF

————————

On Appeal From The United States District Court
For The Central District of California
District Court Case 2:12-cv-05808-SVW-AGR

————————

JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP
MICHAEL J. SALTZ, STATE BAR NO. 189751
COLBY A. PETERSEN, STATE BAR NO. 274387
BLAIR SCHLECTER, STATE BAR NO. 233684 (OF COUNSEL)
10866 WILSHIRE BOULEVARD, SUITE 1550
LOS ANGELES, CALIFORNIA 90023
TELEPHONE: (310) 446-9900
FACSIMILE: (310) 446-9909
*Attorneys for Defendant-Appellee The Screening Pros, LLC*

## **TABLE OF CONTENTS**

I.    INTRODUCTION. ............................................................................1

II.   THIS COURT CAN AND SHOULD TAKE JUDICIAL NOTICE OF
THE CONGRESSIONAL HISTORY AND 2011 FTC STAFF
REPORT REGARDING FCRA. ......................................................2

III.  THE CONGRESSIONAL RECORD IS RELEVANT TO
ESTABLISH THAT TSP PROPERLY REPORTED MR. MORAN'S
CRIMINAL HISTORY INCLUDING HIS CRIMINAL CASE
RESULTING IN DISMISSAL IN 2004. ..........................................4

IV.  THE 2011 FTC STAFF REPORT IS ALSO RELEVANT TO
ESTABLISH THAT TSP PROPERLY REPORTED MR. MORAN'S
CRIMINAL HISTORY. ...................................................................7

V.   CONCLUSION...............................................................................9

## I. INTRODUCTION.

Appellee The Screening Pros, LLC ("TSP") respectfully requests that this Court take judicial notice of the Congressional Record of the Senate and House of Representatives regarding the Consumer Reporting Employment Clarification Act of 1998, a Bill Summary and Status for the same Act, and portions of a 2011 Report by the Federal Trade Commission ("FTC") on the Fair Credit Reporting Act ("FCRA").

The present appeal concerns in part Appellant Gabriel Moran's contention that TSP's reporting of Mr. Moran's criminal history now violates FCRA. Mr. Moran claims that a 1998 amendment to FCRA altered the operative reporting period with regard to credit agency's reporting of criminal cases resulting in dismissal. Specifically, he claims that while FCRA previously limited the reporting of criminal dismissals to seven years from date of disposition of the case, the 1998 amendment changed the rule to start the reporting period from the date of indictment.

The Congressional history of the 1998 amendment is relevant to rebut Mr. Moran's contentions. The Congressional Record demonstrates that the intent of Congress in amending FCRA was to address concerns by employers in the trucking industry regarding FCRA regulations that forced the industry to add multiple, unnecessary steps to its hiring process. Congress' other intent was to

1

allow criminal convictions to be reported indefinitely. Importantly, at no time did Congress express an intent to change the long-standing rule that the seven year period for reporting criminal dismissals starts from the date of disposition.

The Congressional Record is an official record and from a source "whose accuracy cannot reasonably be questioned" – the federal government. The Record is relevant to establish that the operative seven year date for reporting criminal dismissals starts from date of disposition, not date of indictment. Therefore, the documents should be judicially noticed for this appeal.

TSP also seeks judicial notice of relevant portions of a 2011 FTC Staff Report on FCRA (2011 Staff Report). This Report confirms that the operative reporting date for criminal dismissals begins from the date of disposition of the case. The document is an official government document and not reasonably the subject of dispute. Therefore, the Court should take notice of this document as well.

## II. THIS COURT CAN AND SHOULD TAKE JUDICIAL NOTICE OF THE CONGRESSIONAL HISTORY AND 2011 FTC STAFF REPORT REGARDING FCRA.

Under *Federal Rules of Evidence*, Rule 201, the Court may judicially notice a fact that is not subject to reasonable dispute because it "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.

2

R. Evid., R. 201(b). The Court must take judicial notice if a party requests it and is supplied with the necessary information. Fed. R. Evid., R. 201(c).

In this case, TSP seeks judicial notice of the Congressional Record of the Senate and House of Representatives regarding the Consumer Reporting Employment Act of 1998. (True and correct copies of the Senate and House of Representative Records are attached as Exhibits "A" and "B"). TSP also seeks notice of the Bill Summary & Status for the Act. (A true and correct copy of this Bill Summary and Status is attached as Exhibit "D.") These documents and the statements therein are official records of the United States government whose accuracy is not subject to reasonable dispute and whose facts can be accurately and readily determined from reliable sources. See *Anderson v. Holder*, 673 F.3d 1089, 1094, fn. 1 (9th Cir. 2012) ("Legislative history is properly a subject of judicial notice."); *Chaker v. Crogan*, 428 F.3d 1215, 1223, fn. 8 (9th Cir. 2005); *Oneida Indian Nation of New York v. State of N.Y.*, 691 F.2d 1070, 1086 (2d Cir. 1982); *Paralyzed Veterans of Am. v. McPherson*, 2006 WL 3462780, *4 (N.D. Cal. 2006); *Zephyr v. Saxon Mortgage Servs., Inc.*, 873 F.Supp.2d 1223, 1226 (E.D. Cal. 2012) (taking judicial notice of the legislative history of *Penal Code* Section 632).

Similarly, TSP seeks judicial notice of an official FTC Staff Report. (A true and correct copy of "Federal Trade Commission, 40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary Interpretations"

(July 2011), pgs 1, 7, 8, 16 (fn. 60), 55, 57 and 99-107, is attached as Exhibit "C.") ("2011 Staff Report"). This 2011 Staff Report is an official government report and properly the subject of judicial notice. *Transmission Agency of N. California v. Sierra Pac. Power Co.*, 295 F.3d 918 (9th Cir. 2002) (taking judicial notice of decision issued by Federal Energy Regulatory Commission); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 (9th Cir. 2004) ("We may take judicial notice of a record of a state agency not subject to reasonable dispute."). In this case, both Mr. Moran and the FTC in its *Amicus* Brief have cited to this document, which is not subject to reasonable dispute.

Based on the above, this matter is properly noticeable and is also relevant to this appeal, as set forth below.

### III. THE CONGRESSIONAL RECORD IS RELEVANT TO ESTABLISH THAT TSP PROPERLY REPORTED MR. MORAN'S CRIMINAL HISTORY INCLUDING HIS CRIMINAL CASE RESULTING IN DISMISSAL IN 2004.

Mr. Moran's remaining FCRA claim on appeal is that TSP reported obsolete information about his background. Specifically, he claims that under 15 U.S.C. section 1681c, a reporting agency may not report a criminal case resulting in dismissal more than seven years from date of indictment. From this, he claims that TSP's 2010 reporting of his criminal case, which began in 2000 but was not dismissed until 2004, was improper.

Mr. Moran agrees that as originally written, FCRA permitted reporting of criminal dismissals for seven years from "date of disposition" – meaning dismissal. In 1998, Congress passed the Consumer Reporting Employment Clarification Act which amended FCRA in several respects. See 15 U.S.C. § 1681c(a). Mr. Moran claims that this amendment changed the rule with regard to reporting dismissed criminal cases from date of disposition to date of indictment.

The Congressional Record disputes Mr. Moran's construction of events. Speaking on behalf of the bill, Senator Don Nickles stated that he had been working on the bill for nearly a year "…to address concerns *within the motor carrier industry* with respect to the Fair Credit Reporting Act." (Exhibit A, 144 Cong. Rec. S11638-9 (October 6, 1998) (emphasis added). "The primary issue addressed by the bill relates to problems encountered by a limited number of firms that provide employment screening for national trucking companies." (Exhibit B, 144 Cong. Rec. H10220 (October 8, 1998)). Specifically, the 1996 amendments to FCRA "unintentionally hindered the ability of trucking companies to hire safe, professional truck drivers…" by requiring "…trucking companies to obtain written consent from truck driver applicants before the company may obtain driving records and accidents history information…" (*Id.* at H10220).

The amendment permitted employers to notify potential employees orally, in writing or electronically that they might obtain a consumer report on the potential

employee.  (Exhibit A, at S11639).  "This legislation will expedite the process by which employment background information is exchanged between truck company employers and truck drivers."  (Exhibit B, at H10220).  In other words, the 1998 amendment to FCRA was introduced to assist employers in the trucking industry, not individuals concerned with criminal dismissals.

Congress' other primary purpose was to "include a provision that will allow criminal convictions to be reported past 7 years.  This information is critical to employers in the areas of child care, education, and household services."  (Exhibit A, at S11639).  Last, ". . . the bill provides a number of technical improvements to FCRA that were drafted with the assistance and support of the Federal Trade Commission."  (Exhibit B, at H10220).

Nothing in the history of the amendment reflects any intent to change the operative date for reporting criminal dismissals under section 1681c.  (See Exhibit D).  Rather, the record reflects that Congress intended to limit the reporting of civil suits and to extend indefinitely the reporting of criminal convictions.  (*Id*).

Therefore, this documentation is relevant to rebut Mr. Moran's arguments and this Court should take judicial notice of it.

## IV. THE 2011 FTC STAFF REPORT IS ALSO RELEVANT TO ESTABLISH THAT TSP PROPERLY REPORTED MR. MORAN'S CRIMINAL HISTORY.

The 2011 Staff Report is central to the resolution of this appeal. The Report confirms that the operative date for reporting criminal dismissals runs from the date of dismissal, not the date of indictment.

The 2011 Staff Report states that it is expressly incorporating 1990 Commentary that remains applicable. (Exhibit C, at pg. 7). In particular, the 2011 Staff Report incorporates several 1990 comments by referring them in endnotes. (*Id.* at pg. 16, fn. 60). The 2011 Staff Report explicitly states that, where listed, these 1990 comments are the source of an interpretation. (*Id*).

The 2011 Staff Report states that the 1990 FTC interpretation concerning the dismissal of criminal charges remains applicable. Specifically, the 2011 comment for section 1681c(a)(5) states the following:

> the seven year reporting period for criminal record information 'other than convicted of crimes' runs from *the date of the reported event*.

(*Id.* at pg. 57 (emphasis added)). The comment then cites to endnote 194, which in turn cites "1990 comment 605(a)(5)-2" in the 1990 Commentary which, as noted above, provides that:

> [t]he seven year reporting period runs from the date of *disposition, release or parole, as applicable. For example, if charges are dismissed at or before trial, or*

7

> *the consumer is acquitted, the date of such dismissal or*
> *acquittal is the date of disposition.*

(*Id*; 16 C.F.R. Pt. 600, App. cmt 605(a)(5)-2 (2010) (emphasis added)).

The 2011 Staff Report also directly contradicts the *Amicus* Brief of the FTC and Consumer Financial Protection Bureau ("CFPB"), in which these agencies attempt to claim for the first time that "date of indictment" is the operative date and that endnote 194 is included just for "an interested reader." Their *Amicus* Brief is contradicted by their own Staff Report, which specifically states that the 1990 Commentary as to criminal dismissals remains a good interpretation, and encourages businesses to rely on it. (Exhibit C, at pg. 7 ("staff is instead publishing a compendium of interpretations that it believes will be of use to …the businesses subject to the Commission's jurisdiction under the FCRA … and consumers.")). It is contradicted by the fact that the 2011 Staff Report identifies 1990 Commentary that is no longer good commentary. The list does not include 1990 Comment 605(a)(5)-2, making it clear that this comment is still a good interpretation. (*Id.* at 8, 99). And it is also contradicted by the fact that the 2011 Staff Report references and relies on 1990 comments *over 100 times* in its interpretations of post-1998 FCRA, demonstrating that these endnotes are the source for interpretations and are not just for "an interested reader." (See *Id.* at 100-107).

8

Thus, the FTC confirmed that "date of disposition" remains the operative date for reporting criminal dismissals and this document is relevant to establish same.

## V. CONCLUSION.

Based on the above, TSP respectfully requests that this Court take judicial notice of the Congressional Record regarding the Consumer Reporting Clarification Act of 1998, the Bill Summary and Status, and portions of the 2011 FTC Staff Report.


DATED: January 27, 2014

Respectfully submitted,


By:   /s/ Michael J. Saltz

JACOBSON, RUSSELL, SALTZ,
NASSIM & DE LA TORRE, LLP
MICHAEL J. SALTZ
COLBY A. PETERSEN
BLAIR SCHLECTER (OF COUNSEL)
Attorneys for Defendant-Appellee The
Screening Pros, LLC

## DECLARATION OF MICHAEL J. SALTZ

I, MICHAEL J. SALTZ, declare as follows:

1.  I am an attorney at law admitted to practice before this Court and am counsel for Appellee The Screening Pros, LLC ("TSP") in this matter.  I have personal knowledge of the matter stated in this Declaration and if called upon, I could and would testify as to the matter stated here.

2.  This Declaration is being submitted in support of TSP's Request for Judicial Notice in Support of TSP's Answering Brief.

3.  A true and correct copy of the Congressional Record for the Senate on October 6, 1998 regarding the Consumer Reporting Employment Clarification Act of 1998, S11638-S11639, is attached as Exhibit "A."

4.  A true and correct copy of the Congressional Record for the House of Representatives on October 8, 1998 regarding the Consumer Reporting Employment Clarification Act of 1998, H10218-H10220, is attached as Exhibit "B."

5.  A true and correct copy of "Federal Trade Commission, 40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary Interpretations" (July 2011), pages 1, 7, 8, 16 (fn. 60), 55, 57 and 99-107, is attached as Exhibit "C."

10

6.  A true and correct copy of the Bill Summary & Status for the Consumer Reporting Employment Clarification Act of 1998, S. 2561, is attached as Exhibit "D".

I declare under penalty of perjury under the laws of the United States of America that the matters stated in this Declaration are true.

Executed on January 27, 2014, at Los Angeles, California.


/S/ Michael J. Saltz
MICHAEL J. SALTZ, ESQ.

EXHIBIT "A"

will honor my good friend, Douglas Fontaine, on October 23, 1998, by establishing a scholarship in his name. The scholarship will provide education assistance to future entrepreneurs in the hospitality industry.

Doug literally grew up in the hotel business watching both his parents and grandparents manage the historic "Allison's Wells Spa" in Way, MS. After returning from a tour of duty in Germany where he managed a R & R hotel, he took his turn managing Allison's Wells. Doug eventually moved to Pascagoula, MS, where he has owned and operated the La Font Inn for over 35 years.

As the only Mississippian to have been President and Chairman of the Board of the American Hotel and Motel Association, his program, "Quest for Quality" has been his lasting legacy for hotels around the United States, Europe and the Caribbean.

Doug has been President of such organizations as the Jackson County Heart Fund, Rotary Club, the Pas-Point Navy League, United Way of Jackson County, the Mississippi Hotel and Motel Association, the Gulf Coast Hotel and Motel Association, the Gulf Coast Economic Development Council, the Jackson County Economic Development Council, and the Jackson County Chamber of Commerce.

Doug was also on the committee that worked to bring Naval Station Pascagoula to Mississippi, and he has chaired the committee to "Save the Homeport" for many years.

Currently, Doug serves as a lifetime Director of the American Hotel and Motel Association and as a member of the National Restaurant Association. He also serves on the Board of Director's of the Hancock Bank, a position he has held for over 27 years.

We are very proud of the leadership and example of Doug Fontaine. Our Nation is strong because of people like him. I congratulate him, his wife Lou, and the Mississippi Hotel and Motel Association for making this tribute a lasting legacy that will offer opportunities to younger members of this industry.●

---

## THE REMARKABLE NEW YORK YANKEES

● Mr. MOYNIHAN. Mr. President, I rise today to add my voice to the growing chorus of people proclaiming, "Thank God for baseball!" In this otherwise tumultuous year, the national pastime is back. Mark McGwire and Sammy Sosa broke Ruthian *(and Marisian!)* records, Cal Ripken voluntarily ended his heroic streak of 2,632 consecutive games played (a record which may never be broken) and, most importantly, the New York Yankees and the incomparable Joe Torre are back on top. Well done!

While New Yorkers have grown accustomed to the success of the Bronx Bombers, 1998 is truly a departure from anything we've witnessed of late. The numbers astound. Their 114 regular season victories are the most in baseball since the 1906 Chicago Cubs. Bernie Williams took the batting title, and on May 17 David Wells hurled the first perfect game by a Yankee pitcher since Don Larsen's masterpiece in game five of the 1956 World Series. (I was an aide to Governor Harriman at the time.) On Friday night, after a three-hour rain delay, the Yankees swept the prodigiously talented Texas Rangers 3-0 in their first-round American League playoff series.

Sadly, the season is not without its concerns. Darryl Strawberry, the embattled talent who so bravely and admirably turned his life and career around these past few years, was diagnosed last week with colon cancer. The Yankees outfielder/designated hitter underwent surgery Saturday and the prognosis of a full recovery is excellent. Our prayers are with him.

Tonight, in the Bronx, the Yankees will host the Cleveland Indians in the first game of the American League Championship Series, the winner to face the Atlanta Braves or San Diego Padres in the World Series. No doubt Darryl Strawberry will be in the hearts and minds of the entire team and city, as the Yankees continue their most remarkable season. Just two years ago, the Yankees won the World Series, and I was honored to ride in a motorcade down Broadway with Joe DiMaggio, the original Yankee Clipper. In all likelihood another parade is in the offing.●

---

## RECOGNIZING THE ACCOMPLISHMENTS OF INSPECTORS GENERAL

● Mr. THOMPSON. Mr. President, I applaud the Senate's action in passing a joint resolution, S. J. Res. 58, recognizing the accomplishments of Inspectors General during the last 20 years.

Inspectors General came into being in 1978, when with the leadership of the Senate Governmental Affairs Committee, Congress passed the act creating these vital positions. The initial legislation was modified and expanded in 1988, and today there are IGs at nearly 60 Federal departments, agencies, and other entities. IGs are a unique institution. By design, they are independent voices that owe duties to both Congress and their agency heads. Their job, which is not easy, is to identify and report on waste, fraud, and abuse, and other problems in Federal Government and then recommend solutions.

IGs have served the taxpayers of this country well. Every year, they make recommendations totaling billions of dollars on how our government should spend money more wisely. They return hundreds of millions of dollars to the Federal treasury annually through investigative recoveries. And they help protect the integrity of Federal Government operations by successfully prosecuting thousands of criminal cases and suspending or disbarring thousands of individuals and entities who have taken advantage of the government.

Naturally, IGs are not always popular at their agencies. No official likes to hear that a policy proposal is going to cost too much money or that a favored program suffers from waste, fraud, or abuse. But delivering news about problems, while sometimes unpopular or unwelcome by an agency, is vital to responsive and wise government management.

Thus, we did well to pass this resolution recognizing the achievements of the IGs and thanking them for their services. The Governmental Affairs Committee looks forward to working with the IGs in the future, including considering possible improvements to the IG act to ensure that they are afforded the necessary independence and authority.●

---

## COMMEMORATION OF THE BICENTENNIAL OF THE LIBRARY OF CONGRESS

Ms. SNOWE. Mr. President, I ask unanimous consent the Banking Committee be discharged in further consideration of H.R. 3790, and further that the Senate proceed to its immediate consideration.

The PRESIDING OFFICER. Without objection, it is so ordered. The clerk will report.

The bill clerk read as follows:

A bill (H.R. 3790) to require the Secretary of the Treasury to mint coins in commemoration of the Bicentennial of the Library of Congress.

There being no objection, the Senate proceeded to consider the bill.

Ms. SNOWE. I ask unanimous consent that the bill be deemed read a third time and passed, the motion to reconsider be laid upon the table, and that any statements relating to the bill be printed in the RECORD.

The PRESIDING OFFICER. Without objection, it is so ordered.

The bill (H.R. 3790) was deemed read a third time and passed.

---

## CONSUMER REPORTING EMPLOYMENT CLARIFICATION ACT OF 1998

Ms. SNOWE. Mr. President, I ask unanimous consent that the Senate now proceed to the consideration of S. 2561 introduced earlier today by Senators NICKLES and BRYAN.

The PRESIDING OFFICER. Without objection, it is so ordered. The clerk will report.

The bill clerk read as follows:

A bill (S. 2561) to amend the Fair Credit Reporting Act with respect to furnishing and using consumer reports for employment purposes.

There being no objection, the Senate proceeded to consider the bill.

Mr. NICKLES. Mr. President, Senator BRYAN and I have been working for nearly a year to address concerns within the motor carrier industry with

*October 6, 1998*          CONGRESSIONAL RECORD — SENATE          **S11639**

respect to the Fair Credit Reporting Act. I would like to thank Senator BYRAN for his leadership on this important legislation. We have been working to ensure all involved parties are in agreement with the changes to the Fair Credit Reporting Act in this bill.

The Consumer Credit Reporting Reform Act of 1996, which passed as part of the Omnibus Conciliation Appropriations Act of 1997, contained reforms to the Fair Credit Reporting Act which are in conflict with the reality of how the motor carrier industry hires safe, responsible drivers.

We have reached an agreement with consumer groups, including U.S. PIRG, the chairman and ranking member of the Banking Committee, the Federal Trade Commission, and the credit industry which will not reduce consumer protections but will ensure a fair process for the regulated community. I would like to thank everyone for their help throughout this process on this important legislation.

This legislation will more appropriately address the manner in which the trucking industry hires safe, responsible drivers. If an individual applies for employment by mail, telephone, or electronic means, the employer can notify the potential employee orally, in writing, or electronically, that a consumer report may be obtained for employment purposes. The applicant must then consent to the procurement of that report.

This legislation will also allow an employer within the trucking industry, if the potential employee has applied for employment by mail, telephone, or electronically, to take adverse action based on the report and then notify the consumer within three business days that adverse action has been taken.

In addition, this bill also includes a provision that will allow criminal convictions to be reported past 7 years. This information is critical to employers in the areas of child care, education, and household services.

And finally we have included technical amendments to the Fair Credit Reporting Act that, again, the Federal Trade Commission and the regulated community are in agreement with.

It is essential that this commonsense legislation pass the Senate this year and I encourage my colleagues to support this bill. I want to again thank everyone for their support on this issue and I thank my colleagues Senator SARBANES, Senator BRYAN, Senator MACK, and others on the Banking Committee for their leadership on the Fair Credit Reporting Act.

Ms. SNOWE. Mr. President, I ask unanimous consent that the bill be read a third time and passed, the motion to reconsider be laid upon the table, and that any statements relating to the bill be printed in the RECORD.

The PRESIDING OFFICER. Without objection, it is so ordered.

The bill (S. 2561) was considered read the third time and passed.

(The text of the bill will be printed in a future edition of the RECORD.)

---

## MIGRATORY BIRD HUNTING AND CONSERVATION STAMPS

Ms. SNOWE. Mr. President, I ask unanimous consent that the Senate now proceed to the consideration of H.R. 4248 which is at the desk.

The PRESIDING OFFICER. The clerk will report.

The bill clerk read as follows:

A bill (H.R. 4248) to authorize the use of receipts from the sale of the Migratory Bird Hunting and Conservation Stamp to promote additional stamp purposes.

There being no objection, the Senate proceeded to consider the bill.

Mr. CHAFEE. Mr. President, I am pleased to offer my support for the Migratory Bird Hunting and Conservation Stamp Promotion Act of 1998, or the Duck Stamp Act as it is more commonly known.

In 1934 President Roosevelt signed into law the Migratory Bird Hunting Stamp Act (Act). The Act required that all waterfowl hunters 16 years of age and over must annually purchase and carry a Federal Duck Stamp. The revenue generated from duck stamp sales is earmarked for the Migratory Bird Conservation Fund to buy or lease waterfowl sanctuaries. As a result, many of the nation's wildlife refuges have been purchased in whole or part with duck stamp funds.

Although the Duck Stamp program has been extremely successful, the Act does not provide funds to market and advertise duck stamps. This legislation authorizes the Secretary of the Interior to use up to $1 million a year in duck stamp receipts until 2003 for marketing purposes. To ensure that this program is a success the marketing plan has to be approved by the Migratory Bird Conservation Commission prior to implementation.

Duck stamp sales could increase substantially if funds were available to market the stamp, and I urge my colleagues in the Senate to support H.R. 4248.

Ms. SNOWE. Mr. President, I ask unanimous consent that the bill be considered read a third time and passed, the motion to reconsider be laid upon the table, and that any statements relating to the bill be printed in the RECORD.

The PRESIDING OFFICER. Without objection, it is so ordered.

The bill (H.R. 4248) was considered read the third time and passed.

---

## NATIONAL FISH AND WILDLIFE FOUNDATION ESTABLISHMENT ACT AMENDMENTS OF 1998

Ms. SNOWE. Mr. President, I ask unanimous consent that the Senate now proceed to the consideration of Calendar No. 434, S. 2095.

The PRESIDING OFFICER. The clerk will report.

The bill clerk read as follows:

A bill (S. 2059) to reauthorize and amend the National Fish and Wildlife Foundation Establishment Act.

There being no objection, the Senate proceeded to consider the bill which had been reported from the Committee on Environment and Public Works, with amendments; as follows:

(The parts of the bill intended to be stricken are shown in boldface brackets and the parts of the bill intended to be inserted are shown in italic.)

S. 2095

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE.

This Act may be cited as the "National Fish and Wildlife Foundation Establishment Act Amendments of 1998".

SEC. 2. PURPOSES.

Section 2(b) of the National Fish and Wildlife Foundation Establishment Act (16 U.S.C. 3701(b)) is amended by striking paragraph (1) and inserting the following:

"(1) to encourage, accept, and administer private gifts of property for the benefit of, or in connection with, the activities and services of the Department of the Interior or the Department of Commerce, particularly the United States Fish and Wildlife Service and the National Oceanic and Atmospheric Administration, to further the conservation and management of fish, wildlife, and plant resources;".

SEC. 3. BOARD OF DIRECTORS OF THE FOUNDATION.

(a) ESTABLISHMENT AND MEMBERSHIP.—Section 3 of the National Fish and Wildlife Foundation Establishment Act (16 U.S.C. 3702) is amended by striking subsection (a) and inserting the following:

"(a) ESTABLISHMENT AND MEMBERSHIP.—

"(1) IN GENERAL.—The Foundation shall have a governing Board of Directors (referred to in this Act as the 'Board'), which shall consist of 25 Directors appointed in accordance with subsection (b), each of whom shall be a United States citizen.

"(2) REPRESENTATION OF DIVERSE POINTS OF VIEW.—To the maximum extent practicable, the membership of the Board shall represent diverse points of view relating to conservation and management of fish, wildlife, and plants.

"(3) NOT FEDERAL EMPLOYEES.—Appointment as a Director of the Foundation shall not constitute employment by, or the holding of an office of, the United States for the purpose of any Federal law.".

(b) APPOINTMENT AND TERMS.—Section 3 of the National Fish and Wildlife Foundation Establishment Act (16 U.S.C. 3702) is amended by striking subsection (b) and inserting the following:

"(b) APPOINTMENT AND TERMS.—

"(1) AGENCY HEADS.—The Director of the United States Fish and Wildlife Service and the Under Secretary of Commerce for Oceans and Atmosphere shall be Directors of the Foundation.

"(2) APPOINTMENTS BY THE SECRETARY OF THE INTERIOR.—

"(A) IN GENERAL.—Subject to subparagraph (B), after consulting with the Secretary of Commerce and considering the recommendations submitted by the Board, the Secretary of the Interior shall appoint 23 Directors who meet the criteria established by subsection (a), of whom—

"(i) at least 6 shall be knowledgeable or experienced in fish and wildlife conservation;

"(ii) at least 4 shall be educated or experienced in the principles of fish and wildlife management; and

"(iii) at least 4 shall be knowledgeable or experienced in ocean and coastal resource conservation.

"(B) TRANSITION PROVISION.—

"(i) CONTINUATION OF TERMS.—The 15 Directors serving on the Board as of the date of

EXHIBIT "B"

have been added. Many Democratic Members, including myself, would have liked to include positive proactive legislation for consumers. For example, I would have like to increase the limit for the applicability for nonmortgage Truth in Lending Act coverage from $25,000 to $50,000 so that consumers who buy a vehicle that costs more than $25,000 would be protected by TILA. These kinds of provisions, however, were held off in the spirit of pragmatism, trying to move a bill quickly and not to bog it down in controversy.

Let me finally say, regulatory burden relief can generally be a good premise, but not if it breaches consumer protection OR safety and soundness boundaries. It cannot be an excuse for the lowest common denominator with regards to consumers, communities and safety and soundness. I supported working on this legislation so that we can maintain a non-partisan, non-controversial stance on some needed changes. There are unnecessary changes, however, that were suggested.

For example, there are provisions in the regulatory relief bill that has been pending in the other body and I do find very egregious. They are absent in this bill and I appreciate the willingness to work together on this bill without those sort of provisions. That is what has made this bill a suspension bill today. Because of our less controversial approach, we may well have facilitated the positive consideration of this legislation in the very limited window we have left.

Mrs. ROUKEMA. Mr. Speaker, I yield back the balance of my time.

The SPEAKER pro tempore. The question is on the motion offered by the gentlewoman from New Jersey (Mrs. ROUKEMA) that the House suspend the rules and pass the bill, H.R. 4364, as amended.

The question was taken; and (two-thirds having voted in favor thereof) the rules were suspended and the bill, as amended, was passed.

A motion to reconsider was laid on the table.

### GENERAL LEAVE

Mrs. ROUKEMA. Mr. Speaker, I ask unanimous consent that all Members may have 5 legislative days within which to revise and extend their remarks on H.R. 4363, the bill just passed.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from New Jersey?

There was no objection.

### CONSUMER REPORTING EMPLOYMENT CLARIFICATION ACT OF 1998

Mr. LEACH. Mr. Speaker, I move to suspend the rules and pass the Senate bill (S. 2561) to amend the Fair Credit Reporting Act with respect to furnishing and using consumer reports for employment purposes.

The Clerk read as follows:

S. 2561

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE.

This Act may be cited as the "Consumer Reporting Employment Clarification Act of 1998".

SEC. 2. USE OF CONSUMER REPORTS FOR EMPLOYMENT PURPOSES.

(a) DISCLOSURE TO CONSUMER.—Section 604(b)(2) of the Fair Credit Reporting Act (15 U.S.C. 1681b(b)(2)) is amended to read as follows:

"(2) DISCLOSURE TO CONSUMER.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless—

"(i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and

"(ii) the consumer has authorized in writing (which authorization may be made on the document referred to in clause (i)) the procurement of the report by that person.

"(B) APPLICATION BY MAIL, TELEPHONE, COMPUTER, OR OTHER SIMILAR MEANS.—If a consumer described in subparagraph (C) applies for employment by mail, telephone, computer, or other similar means, at any time before a consumer report is procured or caused to be procured in connection with that application—

"(i) the person who procures the consumer report on the consumer for employment purposes shall provide to the consumer, by oral, written, or electronic means, notice that a consumer report may be obtained for employment purposes, and a summary of the consumer's rights under section 615(a)(3); and

"(ii) the consumer shall have consented, orally, in writing, or electronically to the procurement of the report by that person.

"(C) SCOPE.—Subparagraph (B) shall apply to a person procuring a consumer report on a consumer in connection with the consumer's application for employment only if—

"(i) the consumer is applying for a position over which the Secretary of Transportation has the power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of title 49, or a position subject to safety regulation by a State transportation agency; and

"(ii) as of the time at which the person procures the report or causes the report to be procured the only interaction between the consumer and the person in connection with that employment application has been by mail, telephone, computer, or other similar means.".

(b) CONDITIONS ON USE FOR ADVERSE ACTIONS.—Section 604(b)(3) of the Fair Credit Reporting Act (15 U.S.C. 1681b(b)(3)) is amended to read as follows:

"(3) CONDITIONS ON USE FOR ADVERSE ACTIONS.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), in using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates—

"(i) a copy of the report; and

"(ii) a description in writing of the rights of the consumer under this title, as prescribed by the Federal Trade Commission under section 609(c)(3).

"(B) APPLICATION BY MAIL, TELEPHONE, COMPUTER, OR OTHER SIMILAR MEANS.—

"(i) If a consumer described in subparagraph (C) applies for employment by mail, telephone, computer, or other similar means, and if a person who has procured a consumer report on the consumer for employment purposes takes adverse action on the employment application based in whole or in part on the report, then the person must provide to the consumer to whom the report relates,

in lieu of the notices required under subparagraph (A) of this section and under section 615(a), within 3 business days of taking such action, an oral, written or electronic notification—

"(I) that adverse action has been taken based in whole or in part on a consumer report received from a consumer reporting agency;

"(II) of the name, address and telephone number of the consumer reporting agency that furnished the consumer report (including a toll-free telephone number established by the agency if the agency compiles and maintains files on consumers on a nationwide basis);

"(III) that the consumer reporting agency did not make the decision to take the adverse action and is unable to provide to the consumer the specific reasons why the adverse action was taken; and

"(IV) that the consumer may, upon providing proper identification, request a free copy of a report and may dispute with the consumer reporting agency the accuracy or completeness of any information in a report.

"(ii) If, under clause (B)(i)(IV), the consumer requests a copy of a consumer report from the person who procured the report, then, within 3 business days of receiving the consumer's request, together with proper identification, the person must send or provide to the consumer a copy of a report and a copy of the consumer's rights as prescribed by the Federal Trade Commission under section 609(c)(3).

"(C) SCOPE.—Subparagraph (B) shall apply to a person procuring a consumer report on a consumer in connection with the consumer's application for employment only if—

"(i) the consumer is applying for a position over which the Secretary of Transportation has the power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of title 49, or a position subject to safety regulation by a State transportation agency; and

"(ii) as of the time at which the person procures the report or causes the report to be procured the only interaction between the consumer and the person in connection with that employment application has been by mail, telephone, computer, or other similar means.".

SEC. 3. PROVISION OF SUMMARY OF RIGHTS.

Section 604(b)(1)(B) of the Fair Credit Reporting Act (15 U.S.C. 1681b(b)(1)(B)) is amended by inserting ", or has previously provided," before "a summary".

SEC. 4. NATIONAL SECURITY INVESTIGATION CONFORMING AMENDMENTS.

(a) GOVERNMENT AS END USER.—Section 609(a)(3) of the Fair Credit Reporting Act (15 U.S.C. 1681g(a)(3)) is amended by adding at the end the following:

"(C) Subparagraph (A) does not apply if—

"(i) the end user is an agency or department of the United States Government that procures the report from the person for purposes of determining the eligibility of the consumer to whom the report relates to receive access or continued access to classified information (as defined in section 604(b)(4)(E)(i)); and

"(ii) the head of the agency or department makes a written finding as prescribed under section 604(b)(4)(A).".

(b) NATIONAL SECURITY INVESTIGATIONS.—Section 613 of the Fair Credit Reporting Act (15 U.S.C. 1681k) is amended—

(1) by inserting "(a) IN GENERAL.—" before "A consumer"; and

(2) by adding at the end the following:

"(b) EXEMPTION FOR NATIONAL SECURITY INVESTIGATIONS.—Subsection (a) does not apply in the case of an agency or department of the

*October 8, 1998*  CONGRESSIONAL RECORD—HOUSE  H10219

United States Government that seeks to obtain and use a consumer report for employment purposes, if the head of the agency or department makes a written finding as prescribed under section 604(b)(4)(A).''.

**SEC. 5. CIVIL SUITS AND JUDGMENTS.**

Section 605(a) of the Fair Credit Reporting Act (15 U.S.C. 1681c(a)) is amended—

(1) in paragraph (2), by striking "Suits and Judgments which" and inserting "Civil suits, civil judgments, and records of arrest that'';

(2) by striking paragraph (5);

(3) in paragraph (6), by inserting ", other than records of convictions of crimes'' after "of information''; and

(4) by redesignating paragraph (6) as paragraph (5).

**SEC. 6. TECHNICAL AMENDMENTS.**

The Fair Credit Reporting Act (15 U.S.C. 1601 et seq.) is amended—

(1) in section 603(d)(2)(A)(iii), by striking "any communication" and inserting "communication'';

(2) in section 603(o)(1), by striking "(d)(2)(E)" and inserting "(d)(2)(D)'';

(3) in section 603(o)(4), by striking "or'' at the end and inserting "and'';

(4) in section 604(g), by striking "or a direct marketing transaction'';

(5) in section 611(a)(7), by striking "(6)(B)(iv)'' and inserting "(6)(B)(iii)''; and

(6) in section 621(b), by striking "or (e)''.

**SEC. 7. EFFECTIVE DATE.**

The amendments made by this Act shall be deemed to have the same effective date as the amendments made by section 2403 of the Consumer Credit Reporting Reform Act of 1996 (Public Law 104–208; 110 Stat. 3009–1257).

The SPEAKER pro tempore. Pursuant to the rule, the gentleman from Iowa (Mr. LEACH) and the gentleman from New York (Mr. LAFALCE) each will control 20 minutes.

The Chair recognizes the gentleman from Iowa (Mr. Leach).

Mr. LEACH. Mr. Speaker, I yield myself such time as I may consume.

(Mr. LEACH asked and was given permission to revise and extend his remarks.)

Mr. LEACH. Mr. Speaker, S. 2561, the Consumer Reporting Employment Clarification Act of 1998 amends the Fair Crediting Reporting Act FCRA to revise certain changes that were made to the act last Congress. Some of these changes had inadvertent consequences on the trucking industry's hiring practices.

Specifically, the bill amends the FCRA to remove burdensome restrictions so that trucking companies will be able to conduct background investigations of driver applicants in a timely and efficient manner to help ensure highway safety.

S. 2561 has bipartisan support and the agreement of the Federal Trade Commission and consumer advocacy groups. The bill is also strongly supported by the American Trucking Association and the Truckload Carriers Association.

The legislation also amends the FCRA so employers have access to critical information in order to make informed hiring decisions. Current law exempts convictions of crime from consumer reports after 7 years for individuals applying for jobs with an annual

salary of less than $75,000. S. 2561 would remove this exemption. Such information is particularly crucial in the hiring process for employers in the area of child or elderly care, school bus driving, and household services.

This bill provides for small changes to the FCRA that will have a significant impact on the efficiency of many employers' hiring practices, resulting in a safer environment for all.

I would like to commend Senator NICKLES, Senator BRYAN, and Senator MACK for their work on this legislation and the gentleman from Oklahoma (Mr. LUCAS) and the gentleman from Oklahoma (Mr. WATTS) for their leadership in the House and the gentleman from New York (Mr. LAFALCE) for his cooperation in ensuring that this important legislation is able to be brought before us at the last moments of this Congress.

By background, on September 30, 1996, Congress enacted amendments to the Fair Credit Reporting Act (FCRA) that unintentionally hindered the ability of trucking companies to hire safe, professional truck drivers. The new regulations, which went into effect last Fall, require trucking companies to obtain written consent from truck driver applicants before the company may obtain driving records and accidents history information required by the Federal Highway Administration.

the hiring process in the trucking industry, which employs over 3.5 million drivers, depends on an immediate ability to verify a driver's safety and employment history before a company will put a driver behind the wheel. Because of the high volume of applicants and the need to verify instantly safety and employment information, many trucking companies utilize an "800" number system. Under this system, trucking carriers will accept applications for employment over the telephone, and immediately orders a background report to determine if the applicant meets the carriers' hiring requirements. Due to the industry's high standards, the industry hires only one of every ten applicants.

The new FCRA regulations have forced the trucking industry to add multiple, unnecessary steps to its hiring procedures, especially since these background checks are already required under federal law. Moreover, because of the burdensome paperwork requirements under these regulations, and because the industry is currently facing a critical shortage of drivers, many carriers will have no choice but to put drivers behind the wheel before their safety records can be verified. This obviously raises serious highway safety concerns. For all these reasons, the trucking industry strongly supports an amendment to FCRA that would permit trucking companies to accept an applicants consent over the telephone.

Section 604 of the FCRA establishes, among other items, the conditions under which a consumer reporting agency may furnish a consumer report for employment purposes. Current law requires prospective employers to certify to the consumer reporting agency that certain notices, including a summary of rights in the event of adverse action, have been given to the consumer and that information from the report will be used for lawful purposes.

In addition, the consumer reporting agency may only furnish a report to a prospective em-

ployer if the agency provides with the report the summary of consumer rights. The amendment establishes that the intent of the statute can be met without the consumer reporting agency providing the summary every time a report is obtained. Instead, the requirement is satisfied if the consumer reporting agency has previously provided a summary of rights. The amendment codifies interpretive letter of the Federal Trade Commission in this area.

Section 4 amendments are conforming amendments for provisions added to Section 604(b)(4) in the Intelligence Authorization Act of 1998. These provisions created an exception for providing certain disclosures to consumers if a written determination was obtained from the relevant agency that the disclosure would threaten national security, endanger an individual's safety or hamper an official investigation. The proposed amendments provide for full compliance with the Intelligence Authorization provisions and protect consumer reporting agencies from unwarranted liability.

The Intelligence Authorization Act amendments failed to make conforming exceptions for requirements imposed upon consumer reporting agencies. First, under Section 609, a consumer reporting agency must, upon request, disclose to the consumer the end-user of the report. The amendment would provide an exception to that requirement if the relevant agency makes the appropriate written determination.

Second, under Section 613, consumer reporting agencies may be required to provide consumers with the name and address of person seeking consumer reports consisting of public record information. The amendment establishes an exception for disclosing this information in the context of the national security area.

Under current law, if an individual is seeking a job with an annual salary below $75,000, no records of criminal activity, including convictions, may be reported if they antedate the report by more than seven years. This information may be of critical value to prospective employers, especially those in the areas of child or elderly care, school bus driving and household services. Under the bill, convictions of crimes from the seven-year obsolescence period would be exempted.

All in all this is a common sense bill designed to protect the public. I encourage support of all members.

Mr. Speaker, I reserve the balance of my time.

Mr. LAFALCE. Mr. Speaker, I yield myself such time as I may consume.

(Mr. LAFALCE asked and was given permission to revise and extend his remarks.)

Mr. LAFALCE. Mr. Speaker, I rise in support of S. 2561, associate myself fully with the remarks of the distinguished chairman of the Committee on Banking and Financial Services, the gentleman from Iowa (Mr. LEACH).

Mr. Speaker, I rise in support of S. 2561, a bill to provide limited clarifications and technical corrections to the Fair Credit Reporting Act. I want to thank the Chairman of the Banking Committee for bringing this legislation to the floor under suspension.

While I believe we need to be extremely cautious in accepting any proposal to revise the Fair Credit Reporting Act, especially those offered in the rush before adjournment, let me

say that I have closely reviewed this bill and have no objections. The exceptions that the bill creates from current FCRA requirements are justifiable and are very narrowly targeted. In addition, the bill provides a number of technical improvements to FCRA that were drafted with the assistance and support of the Federal Trade Commission.

The primary issue addressed by the bill relates to problems encountered by a limited number of firms that provide employment screening for national trucking companies. Under FCRA any report on an individual produced by a hired third party falls under the category of a "consumer report". It requires, where such reports are prepared for employment purposes, that certain disclosures be provided in writing to the individual who is the subject of the report; that the individual provide written authorization for release of the report and that the employer provide a written copy of the report to the applicant where an adverse decision is made based on information in the report.

Since the companies providing employment screening for trucking firms seek applications in all parts of the country and communicate primarily by telephone, fax or mail, current FCRA requirements that disclosures and authorizations be made in person and in writing are inappropriate and burdensome. The legislation would add several narrowly crafted exceptions to FCRA that would permit—where employment applications are taken by phone, mail or electronically—greater flexibility in providing required disclosures and authorizations either by "oral, written or electronic means", and in permitting delivery of a credit report to an applicant within three days after an adverse employment decision.

I believe these exceptions are reasonable and have been crafted to apply very narrowly only to truck driving positions that are defined and regulated under Federal law. The bill also

makes a number of additional technical changes, most of which are intended to correct drafting errors made in the 1996 FCRA Amendments.

Mr. Speaker, the clarifications made by S. 2561 are supported by the Federal Trade Commission, they have been signed-off on by U.S. PIRG, and they have raised no objections among the major national consumer organizations.

I urge that the House suspend the rules and adopt S. 2561.

Mr. LUCAS of Oklahoma. Mr. Speaker, I rise today in strong support of the "Consumer Reporting Employment Clarification Act of 1998."

I would like to thank Banking Committee Chairman LEACH and Ranking Member LA-FALCE, House Leadership, Senators CONNIE MACK and RICHARD BRYAN, and Senate Assistant Majority Leader DON NICKLES—Oklahoma's Senior Senator—for their hard work on and their support of this legislation that will streamline the trucking industry's hiring of competent, professional, and safe truck drivers.

Unfortunately, current Fair Credit Reporting Act (FCRA) regulations have forced the trucking industry to add multiple, unnecessary steps to its hiring procedures. Worse, because of burdensome paperwork requirements under these regulations, and because the industry is currently facing a critical shortage of drivers, many carriers have been forced to put drivers behind the wheel before their safety records can be verified. This is not what Congress intended when it enacted changes to the FCRA.

This legislation will expedite the process by which employment background information is exchanged between truck company employers and truck drivers. Instead of having to obtain written consent from a potential employee to procure a consumer report, truck company employers will not be able to obtain a potential

employee's consent by mail, over the telephone, or by means of computer or fax machine.

I encourage my colleagues to support this bill. It has received the endorsement of the Federal Trade Commission—which enforces the FCRA—major credit institutions, consumer advocacy groups, and is strongly supported by the American Truckers Association and by trucking companies and truckers in Oklahoma.

Let's put highway safety before bureaucratic red tape and correct this safety problem immediately, and vote for this legislation.

Again, I would like to thank those involved in the process of bringing this legislation to the floor.

Mr. LAFALCE. Mr. Speaker, I yield back the balance of my time.

Mr. LEACH. Mr. Speaker, I yield back the balance of my time.

The SPEAKER pro tempore. The question is on the motion offered by the gentleman from Iowa (Mr. LEACH) that the House suspend the rules and pass S. 2561.

The question was taken; and (two-thirds having voted in favor thereof) the rules were suspended and the Senate bill was passed.

A motion to reconsider was laid on the table.

---

## GENERAL LEAVE

Mr. LEACH. Mr. Speaker, I ask unanimous consent that all Members may have 5 legislative days within which to revise and extend their remarks on S. 2561, the Senate bill just passed.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Iowa?

There was no objection.

EXHIBIT "C"

# 40 YEARS OF EXPERIENCE
## WITH THE FAIR CREDIT REPORTING ACT
### AN FTC STAFF REPORT WITH SUMMARY OF INTERPRETATIONS

July 2011
Federal Trade Commission

## I.    Introduction

The Fair Credit Reporting Act[1] ("FCRA") governs the collection, assembly, and use of consumer report information and provides the framework for the credit reporting system in the United States. The FCRA was enacted in 1970, and it has been amended several times in the ensuing years. The two most extensive amendments were the Consumer Credit Reporting Reform Act of 1996 (the "1996 amendments")[2] and the Fair and Accurate Credit Transactions Act of 2003 ("FACT Act").[3]

The FCRA regulates the practices of consumer reporting agencies ("CRAs") that collect and compile consumer information into consumer reports for use by credit grantors, insurance companies, employers, landlords, and other entities in making eligibility decisions affecting consumers. Information included in consumer reports generally may include consumers' credit history and payment patterns, as well as demographic and identifying information[4] and public record information (e.g., arrests, judgments, and bankruptcies). Consumer report information may be used by entities to predict the risk of future nonpayment, default, or other adverse events. The FCRA was enacted to (1) prevent the misuse of sensitive consumer information by limiting recipients to those who have a legitimate need for it; (2) improve the accuracy and integrity of consumer reports; and (3) promote the efficiency of the nation's banking and consumer credit systems.

As described below, since its initial passage in 1970, the Federal Trade Commission ("FTC" or "Commission") has played a key role in the implementation, oversight, enforcement, and interpretation of the FCRA. Under the Consumer Financial Protection Act of 2010 ("CFPA"),[5] the FTC retains its enforcement role but will share that role in many respects with the newly-created Consumer Financial Protection Bureau ("CFPB"). The CFPB also will take on primary

---

1.    15 U.S.C. § 1681 *et seq.* The FCRA's provisions are sections 601-629 of the Consumer Credit Protection Act and are commonly cited by those section numbers. The full text of the FCRA, as published on the Commission website, uses both citation forms.

2.    Title II, Subtitle D, Chapter 1, of the Omnibus Consolidated Appropriations Act for Fiscal Year 1997 (Pub. L. No. 104-208, Sept. 30, 1996).

3.    Pub. L. No. 108-159 (Dec. 4, 2003).

4.    The demographic and identifying information (e.g., name, address) generally is not considered "consumer report" information under the FCRA, unless it is used for eligibility determinations. *See In re Trans Union Corp.*, 2000 FTC LEXIS 23 (2000), *aff'd sub nom. Trans Union Corp. v. FTC*, 245 F.3d 809, *reh. denied,* 267 F.3d 1138 (D.C. Cir. 2001), *cert. denied,* 122 S. Ct. 2386 (2002); *FTC v. TRW, Inc.*, Civil No. 3-91-CV2661-H (N.D. Tex. 1993) (consent decree); *Dotzler v. Perot*, 914 F. Supp. 328 (E.D. Mo. 1996). If a CRA obtains demographic and identifying information from a financial institution, however, any redisclosure of that information is subject to the privacy restrictions of the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 *et seq.*

5.    Title X of Pub. L. 111-203 (Dodd-Frank Wall Street Reform and Consumer Protection Act).

a single source, its comprehensive Commentary on the FCRA (the "1990 Commentary"),[33] providing broad guidance on the Commission's interpretation of the provisions of the FCRA.[34] The Commentary had no binding effect, but some courts have accorded it weight as a policy statement of the primary agency responsible for enforcing the FCRA.[35]

## V. FTC Staff Summary and Relationship to 1990 Commentary

Through the passage of time and the adoption of significant amendments to the FCRA, the 1990 Commentary has become partially obsolete, and does not reflect the most current interpretive guidance on the FCRA. Prior to the passage of the CFPA, FTC staff had been working on an updated Commentary as a replacement for the 1990 Commentary. As a result of the CFPA, however, much of the authority of the Commission and the federal financial agencies to publish rules, regulations, or guidelines under the FCRA transfers to the CFPB. In this changed context, staff is instead publishing a compendium of interpretations that it believes will be of use to the CFPB staff, the businesses subject to the Commission's jurisdiction under the FCRA, public representatives, and consumers. The Staff Summary incorporates material from the following sources:

- Interpretations from the 1990 Commentary on sections of the FCRA that have not been amended, which staff continues to believe are timely, accurate, and helpful;

- Issues addressed in informal staff opinions issued after the 1990 Commentary, including post-1996 letters that appear on the Commission's public web site;

- Informal interpretations provided by staff not otherwise reflected in written staff opinions, typically in response to specific questions or fact patterns presented by industry;[36] and

- Commission enforcement actions, and rulemaking proceedings required by the FACT Act.

---

33. 55 Fed. Reg. 18804 (May 4, 1990). The 1990 Commentary was the culmination of a proposal published in August 1988 and the Commission's review of over 100 submissions it received in response to its request for public comments on that proposal. 53 Fed. Reg. 29696 (Aug. 8, 1988).

34. The Commission specified that the interpretations set forth in the 1990 Commentary were not trade regulation rules or regulations and, as provided in section 1.73 of the Commission's rules, did not have the force or effect of statutory provisions.

35. E.g., *Davenport v. Farmers Ins. Group*, 378 F. 3d 839, 843 (8th Cir. 2004); *Estiverne v. Saks Fifth Avenue*, 9 F.3d 1171, 1173 (5th Cir. 1993). The FTC provides extensive guidance and assistance to the private sector and consumers on the requirements and protections of the FCRA. The FTC does outreach to the business community through presentations at industry meetings and conferences, informal advice, and published guidance materials.

36. It had been commonly assumed that the Commission would update the 1990 Commentary at some point. Thus, we continue to receive regular public input on various interpretations of the FCRA.

At the same time the Commission is authorizing issuance of the Staff Summary, it is withdrawing its 1990 Commentary. Although the Summary incorporates certain of the Commentary interpretations verbatim, it also includes various changes. In an effort to streamline this Summary, staff does not include those interpretations from the 1990 Commentary that (1) related to sections of the FCRA that have been repealed or amended; (2) concerned enforcement by entities other than the FTC or the validity of state law; (3) duplicated other interpretations or were otherwise redundant; or (4) had become obsolete or outdated due to changes in technology, industry practices, or other developments.[37] In addition, the interpretations in the Staff Summary differ from the 1990 Commentary in five significant areas, described below.

A. <u>Departments of Motor Vehicles</u>.  Staff does not adopt the 1990 Commentary's position that a Department of Motor Vehicles ("DMV") providing motor vehicle reports for insurance underwriting purposes can be a "consumer reporting agency."[38] The 1990 Commentary (comments 603(d)-4C and 603(f)-10) stated that a motor vehicle report can be a "consumer report" and a DMV that sells such reports for insurance underwriting purposes can be a "consumer reporting agency."[39] Staff now believes that the prior interpretation was problematic, notwithstanding its well-intentioned goal to provide consumers with useful information.

The Commission has never enforced the FCRA against any DMV or other government agency supplying public records. Although a theoretical argument can be made that such public agencies are CRAs based on a literal reading of the FCRA,[40] this interpretation would

---

37. For ease of reference, we have appended a chart of the 1990 Commentary interpretations that are not incorporated in the Staff Summary.

38. *See* 1990 comments 603(d)-4C and 603(f)-10.

39. Those comments essentially adopted a 1973 Commission interpretation (former 16 CFR § 600.4), which resulted from a practical concern that consumers would not be entitled to adverse action notices from insurers taking action on motor vehicle reports if DMVs were not considered CRAs. 38 Fed. Reg. 4945, 4946-47 (Feb. 23, 1973). The Commission stated that the interpretation did not apply to any reports by DMVs for law enforcement or licensing purposes, for which there would generally not otherwise exist a permissible purpose for the DMV (treated as a CRA) to provide the information. The 1990 Commentary retained the interpretation in the face of negative reaction from an appreciable number of public commenters, primarily because no practical problems had arisen over the 17 years the predecessor interpretation had been effective. 55 Fed. Reg. 18804, 18806 (May 4, 1990).

40. Section 603(f) states:
    The term "consumer reporting agency" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

if the solicitation does not set forth the terms of the offer or includes a term that is variable, such as the interest rate on a credit card account.

In the Summary that follows, we use a section-by-section format, similar to the organization used by the Commission in its 1990 Commentary. For the convenience of readers, we reference a large number of 1990 comments[60] and informal staff opinion letters as the source of the interpretations.

---

60. The interpretations in the Summary do not always reflect verbatim the analogous 1990 comments. We have modified some to account for post-1990 FCRA amendments or cases, to make them consistent with other comments, and to make them more relevant to current practice. We have edited others for clarity or to accord with modern style. Even though the 1990 comments listed in the endnotes are not precisely duplicated in the 2011 Staff Summary, staff believes the references will assist readers where a 1990 comment is a source for an interpretation here.

## Section 605 –
## Requirements Relating to Information Contained in Consumer Reports

15 USC 1681c

**Section 605(a)** generally provides time limits beyond which CRAs cannot include information in consumer reports, subject to exceptions set forth in section 605(b).

1. GENERAL

   This section sets forth time periods beyond which CRAs may not include information in consumer reports, except in the circumstances set out in section 605(b).[176] Even if no specific adverse item is reported, a CRA may not furnish a consumer report referencing the existence of adverse information that predates the times set forth in this subsection.[177] Section 605(a) does not require CRAs to report all adverse information within the time periods set forth, but only prohibits them from reporting adverse items beyond those time periods.[178]

2. SECTION APPLIES TO CRAS, NOT USERS

   This section applies only to reporting by CRAs and does not limit creditors or others from using adverse obsolete information. Similarly, this section does not bar a creditor from disclosing adverse obsolete information concerning its transactions or experiences with a consumer, because the information is not a consumer report.[179]

3. DATE THAT CRA ACQUIRED THE INFORMATION IRRELEVANT

   The times or dates set forth in this section relate to the occurrence of events involving adverse information, which determine whether the item is obsolete. The date that the CRA acquired the adverse information is irrelevant to how long that information may be reported.[180]

4. PROVISION LIMITED TO "ADVERSE" INFORMATION

   The seven-year reporting period applies only to "adverse" information that casts the consumer in a negative or unfavorable light. CRAs are not bound by that seven-year limit in reporting dates of employment and educational histories, because such dates are not "adverse" information.[181]

5. RETENTION OF INFORMATION IN FILES

   CRAs may retain adverse information described in subsection (a) and furnish it in reports for purposes that are exempt under subsection (b), described below. For example, the CRA may retain obsolete information for the purpose of furnishing it to persons engaged in (1) credit transactions or the underwriting of life insurance involving a principal amount of $150,000 or more, or (2) the employment of any individual with an annual salary expected to equal $75,000 or more.[182]

**Section 605(a)(1)** prohibits CRAs from reporting "Cases under title 11 of the United States Code or under the Bankruptcy Act that, from the date of entry of the order for relief or the date of adjudication, as the case may be, antedate the report by more than 10 years."

1. RELATION TO OTHER SUBSECTIONS

   Section 605(a) imposes time limitations on reporting of adverse information by CRAs. The reporting of bankruptcies is governed by subsection (a)(1). The reporting of accounts placed for collection or charged to profit and loss is governed by subsection (a)(4). The reporting of

2. "PLACED FOR COLLECTION"

The term "placed for collection" means internal collection activity by the creditor, as well as placement with an outside collector. Placement for collection occurs when dunning notices or other collection efforts are initiated. (A simple "reminder" notice does not constitute placement for collection.) The reporting period is not extended by assignment to another entity for further collection, or by a partial or full payment of the account. A consumer's repayment agreement with the creditor or a collection agency may be treated as a new account that has its own seven year period.[189]

3. "CHARGED TO PROFIT AND LOSS"

The phrase "charged to profit and loss" means action taken by the creditor to write off the account. If an account that was charged off is later paid in part or paid in full by the consumer, the reporting period of seven years from the charge off is not extended by the subsequent payment.[190]

**Section 605(a)(5)** prohibits CRAs from reporting "Any other adverse item of information, other than convictions of crimes which antedates the report by more than seven years."

1. RELATION TO OTHER SUBSECTIONS

This section applies to all adverse information that is not covered by section 605(a)(1)-(4). For example, a delinquent account that has neither been placed for collection, nor charged to profit and loss, may be reported for seven years from the date of the commencement of the delinquency.[191]

2. LIENS

Liens (other than paid tax liens) may be reported as long as they remain filed against the consumer or the consumer's property and remain effective (under any applicable statute of limitations). See comment 605(a)(3)-1.[192] A lien that is paid or otherwise terminated may be reported for seven years from the date it is paid or otherwise rendered ineffective.

3. CRIMINAL CONVICTIONS

A CRA may report information about criminal convictions without any limitation as to length of time that they antedate the report.[193]

4. CRIMINAL RECORDS OTHER THAN CONVICTIONS

The seven year reporting period for criminal record information "other than convictions of crimes" runs from the date of the reported event.[194]

5. IMPACT OF LAWS THAT REQUIRE EMPLOYERS TO SEARCH FOR CRIMINAL RECORDS OVER SEVEN YEARS OLD

A CRA is not permitted to report criminal records other than convictions beyond seven years, even where the CRA is providing information to an employer that state or federal law requires to check criminal records beyond seven years. However, an employer that checks public records on its own is not covered by the FCRA, and therefore may conduct searches without regard to the seven year time limit.[195] See comment 603(d)(1)-6D.

**Section 605(a)(6)** prohibits a CRA from reporting the name or contact information of any medical information furnisher that has notified the CRA of its status, unless

# 1990 COMMENTS NOT INCORPORATED INTO 2011 SUMMARY

| | |
|---|---|
| Comment 603(b)-1 | Redundant. |
| Comment 603(c)-1 | Redundant. |
| Comment 603(d)-3C | Staff Summary adopts different analysis, now discussed in 604(a)(3)(A)-5. |
| Comment 603(d)-4B | Staff Summary adopts different analysis, now discussed in 603(d)-5A. |
| Comment 603(d)-4C | Staff Summary adopts different analysis, now discussed in 603(f)-5B. |
| Comment 603(d)-6B | Staff Summary adopts different analysis, now discussed in 604(a)(3)(A)-5. |
| Comment 603(e)-5 | Redundant. |
| Comment 603(f)-4 | Statutory amendment. |
| Comment 603(f)-6 | Redundant. |
| Comment 603(f)-8 | Staff Summary adopts different analysis, now discussed in 603(f)-4. |
| Comment 603(f)-10 | Staff Summary adopts different analysis, now discussed in 603(f)-5B. |
| Comments 603(i)-1, 2 | Statutory amendment. |
| Comments 604-1A, B, C | Redundant. |
| Comments 604(3)(A)-2 , 3, 4 | Statutory amendment. |
| Comment 604(3)(A)-6 | Statutory amendment. |
| Comment 604(3)(A)-8 | Staff Summary adopts different analysis, now discussed in 603(d)-5A. |
| Comment 604(3)(B)-2 | Redundant. |
| Comment 604(3)(E)-3 | Redundant. |
| Comment 605(a)(1)-1 | Statutory amendment. |
| Comment 605(a)(1)-2 | Redundant. |
| Comment 605(a)(4)-3 | Statutory amendment. |
| Comment 605(a)(5)-1 | Statutory amendment. |
| Comment 605-6 | Redundant. |
| Comments 606-3 | Redundant. |
| Comment 606-4 | Statutory amendment. |
| Comment 607-2F | Obsolete. |
| Comment 607-3C | Obsolete. |
| Comment 607-3D | Redundant. |
| Comment 607-3E | Obsolete. |
| Comment 607-4 | Redundant. |
| Comment 607-5 | Obsolete. |
| Comments 609-2, 3 | Statutory amendment. |
| Comment 609-5 | Obsolete. |
| Comment 609-6 | Statutory amendment. |
| Comment 609-8 | Redundant. |
| Comment 609-12 | Statutory amendment. |
| Comment 610-1 | Statutory amendment. |
| Comment 610-3 | Statutory amendment. |
| Comment 610-5 | Statutory amendment. |
| Comment 610-6 | Not relevant to Commission FCRA enforcement. |
| Comment 611-10 | Statutory amendment. |
| Comment 611-12 | Statutory amendment. |
| Comment 612-1 | Statutory amendment. |
| Comment 612-2 | Statutory amendment. |
| Comment 615-7 | Redundant. |
| Comment 615-3 | Statutory amendment. |
| Comment 615-8 | Statutory amendment. |
| Comment 615-10 | Statutory amendment. |
| Comment 615-12 | Obsolete. |
| Comment 619-1 | Redundant. |
| Comments 621-1, 2, 3, 4 | Not relevant to Commission FCRA enforcement. |

# ENDNOTES

1. 1990 Commentary on the Fair Credit Reporting Act, Appendix to Part 600, comment 603(b)-2 (cited herein as "1990 comment").
2. 1990 comment 603(c)-2.
3. 1990 comment 603(d)-1.
4. Goeke, FTC Informal Staff Opinion Letter, June 9, 1998; Lewis, FTC Informal Staff Opinion Letter, June 11, 1998.
5. Previously section 603(x). Redesignated section 603(y) effective July 21, 2011. See Public Law 111-203, §1088(a)(1)(A).
6. 1990 comment 603(d)-5C.
7. 1990 comment 603(d)-3A.
8. 1990 comment 603(d)-3B.
9. 1990 comment 603(d)-2.
10. Tatelbaum, FTC Informal Staff Opinion Letter, July 26, 2000.
11. 1990 comment 603(d)-4A.
12. 1990 comment 603(d)-4D.
13. 1990 comment 603(d)-4F.
14. 1990 comment 603(d)-5B.
15. 1990 comment 603(d)-4E.
16. 1990 comment 603(d)-4G.
17. Islinger, FTC Informal Staff Opinion Letter, June 9, 1998; Poquette, FTC Informal Staff Opinion Letter, June 9, 1998; Lewis, FTC Informal Staff Opinion Letter, June 11, 1998; Halpern, FTC Informal Staff Opinion Letter, June 11, 1998.
18. Slyter, FTC Informal Staff Opinion Letter, June 12, 1998; Pickett, FTC Informal Staff Opinion Letter, July 10, 1998.
19. Beaudette, FTC Informal Staff Opinion Letter, June 9, 1998.
20. Leathers, FTC Informal Staff Opinion Letter, Sept. 9, 1998; Hinkle, FTC Informal Staff Opinion Letter, July 9, 1998.
21. 1990 comment 603(d)-5A; 1973 Commission Interpretation #2.
22. 1990 comment 603(d)-5D.
23. 1990 comment 603(d)-6A.
24. 1990 comment 603(d)-6C.
25. 1990 comment 603(d)-6D.
26. 1990 comment 603(d)-6F.
27. 1990 comments 603(d)-7A(1) and 603(d)-7A(3).
28. Islinger, FTC Informal Staff Opinion Letter, June 9, 1998.
29. Hinkle, FTC Informal Staff Opinion Letter, July 9, 1998; Pickett, FTC Informal Staff Opinion Letter, July 10, 1998.
30. Novak, FTC Informal Staff Opinion Letter, Sept. 9, 1998.
31. 1990 comment 603(d)-7A(2).
32. Novak, FTC Informal Staff Opinion Letter, Sept. 9, 1998.
33. 1990 comment 603(d)-7B(1).
34. 1990 comment 603(d)-7C(1); Kelley, FTC Informal Staff Opinion Letter, July 16, 1998.
35. 1990 comment 603(d)-7C(2).
36. 1990 comment 603(d)-7C(3).

37.   1990 comment 603(e)-1.
38.   1990 comment 603(e)-2.
39.   1990 comment 603(e)-4.
40.   1990 comment 603(e)-3.
41.   1990 comment 603(e)-7.
42.   Hinkle, FTC Informal Staff Opinion Letter, July 9, 1998; Willner, FTC Informal Staff Opinion Letter, March 25, 1999; Beaudette, FTC Informal Staff Opinion Letter, June 9, 1998.
43.   Hinkle, FTC Informal Staff Opinion Letter, July 9, 1998.
44.   1990 comment 603(e)-6.
45.   1990 comment 603(f)-1A.
46.   1990 comment 603(f)-1B.
47.   1990 comment 603(f)-9; 1973 Commission Interpretation #3.
48.   1990 comment 603(f)-12.
49.   1990 comment 603(f)-2.
50.   In the matter of First American Real Estate Solutions, LLC ("Credco"), FTC File No. 952 3267 (Oct. 28, 1998).
51.   Le Blanc, FTC Informal Staff Opinion Letter, June 9, 1998.
52.   Lee, FTC Informal Staff Opinion Letter, June 28, 1998.
53.   Islinger, FTC Informal Staff Opinion Letter, June 9, 1998; Lewis, FTC Informal Staff Opinion Letter, June 11, 1998.
54.   Cast, FTC Informal Staff Opinion Letter, Oct. 27, 1997.
55.   Credco, FTC File No. 952 3267.
56.   Leathers, FTC Informal Staff Opinion Letter, Sept. 9, 1998.
57.   Sum, FTC Informal Staff Opinion Letter, Sept. 15, 1999.
58.   1990 comment 603(f)-3.
59.   Cast, FTC Informal Staff Opinion Letter, Oct. 27, 1997.
60.   LeBlanc, FTC Informal Staff Opinion Letter, June 9, 1998.
61.   1990 comment 603(f)-7.
62.   1990 comment 603(f)-11; 1973 Commission Interpretation #6.
63.   Copple, FTC Informal Staff Opinion Letter, June 10, 1998; Pickett, FTC Informal Staff Opinion Letter, July 10, 1998.
64.   Goeke, FTC Informal Staff Opinion Letter, June 9, 1998.
65.   1990 comment 603(f)-5.
66.   1990 comment 603(g)-1.
67.   1990 comment 603(g)-2.
68.   Cohan, FTC Informal Staff Opinion Letter, Aug. 1, 2000.
69.   1990 comments 603(g)-3 and 603-4.
70.   1990 comment 603(h)-1.
71.   See Hoke v. Retail Credit Corp., 521 F.2d 1079, 1082 (4th Cir. 1975), cert. denied, 423 U.S. 1087 (1976).
72.   Allison, FTC Informal Staff Opinion Letter, Feb. 23, 1998.
73.   Solomon, FTC Informal Staff Opinion Letter, Oct. 27, 1998.
74.   See Hoke, 521 F.2d at 1082; see also Allison, FTC Informal Staff Opinion Letter, Feb. 23, 1998; Solomon, FTC Informal Staff Opinion Letter, Oct. 27, 1998.
75.   1990 comment 603(h)-2G.
76.   Latour, FTC Informal Staff Opinion Letter, June 28, 2001.
77.   Latour, FTC Informal Staff Opinion Letter, June 28, 2001.
78.   Stinneford, FTC Informal Staff Opinion Letter, July 14, 2000.

79. <u>Gowen</u>, FTC Informal Staff Opinion Letter, April 29, 1999.
80. <u>Schieber</u>, FTC Informal Staff Opinion Letter, March 3, 1998; <u>Hall</u>, FTC Informal Staff Opinion Letter, Oct. 26, 1998.
81. <u>Vail</u>, FTC Informal Staff Opinion Letter, April 5, 1999.
82. <u>Greathouse</u> FTC Informal Staff Opinion Letter, Oct. 20, 1998.
83. <u>Spritz</u>, FTC Informal Staff Opinion Letter, Nov. 5, 1998.
84. <u>Everson</u>, FTC Informal Staff Opinion Letter, July 28, 1998.
85. See <u>Cole v. U.S. Capital, Inc.</u>, 389 F.3d 719 (7th Cir. 2004); <u>Murray v. New Cingular Wireless</u>, 523 F.3d 719 (7th Cir. 2008).
86. <u>Gowen</u>, FTC Informal Staff Opinion Letter, April 29, 1999.
87. <u>Basting</u>, FTC Informal Staff Opinion Letter, June 11, 1998.
88. <u>Basting</u>, FTC Informal Staff Opinion Letter, June 11, 1998.
89. <u>Cohan</u>, FTC Informal Staff Opinion Letter, June 29, 1999.
90. Sections 603(x) and (y) are redesignated sections 603(w) and (x), respectively, effective July 21, 2011. See Public Law 111-203, §1088(a)(1)(A).
91. 1990 comment 604-1.
92. 1990 comment 604-2A.
93. 1990 comment 604-2A.
94. 1990 comment 604-2B.
95. 1990 comment 604G-1.
96. 1990 comment 604(2)-2.
97. 1990 comment 604(3)(E)-6A.
98. 1990 comment 604(3)(E)-6B.
99. 1990 comment 604(3)(E)-6C.
100. 1990 comment 604(3)(E)-6D.
101. 1990 comment 604(3)(E)-6E.
102. 1990 comment 604(3)(E)-5.
103. <u>Shibley</u>, FTC Informal Staff Opinion Letter, June 8, 1999.
104. 1990 comment 604(3)(E)-4.
105. 1990 comment 604G-2.
106. 1990 comment 604G-3.
107. 1990 comment 604(1)-1.
108. 1990 comment 604(1)-2.
109. 1990 comment 604(2)-1.
110. <u>Shibley</u>, FTC Informal Staff Opinion Letter, June 8, 1999.
111. <u>Landever</u>, FTC Informal Staff Opinion Letter, Oct. 12, 1999.
112. <u>Zalenski</u>, FTC Informal Staff Opinion Letter, May 24, 2001.
113. <u>Landever</u>, FTC Informal Staff Opinion Letter, Oct. 12, 1999.
114. 1990 comment 604(3)(A)-7.
115. 1990 comment 604(3)(E)-6B.
116. 1990 comment 604(3)(A)-5A.
117. 1990 comment 604(3)(A)-5B.
118. <u>Gowen</u>, FTC Informal Staff Opinion Letter, April 29, 1999.
119. 1990 comment 604(3)(A)-1A.
120. 1990 comment 604(3)(E)-6E.
121. 1990 comment 604(3)(A)-9.

122. Gowen, FTC Informal Staff Opinion Letter, April 29, 1999; Benner, FTC Informal Staff Opinion Letter, April 30, 1999.
123. Benner, FTC Informal Staff Opinion Letter, April 30, 1999.
124. 1990 comment 604(3)(A)-1B.
125. Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998.
126. 1990 comment 604(3)(A)-4.
127. Tatelbaum 1, FTC Informal Staff Opinion Letter, July 26, 2000; Tatelbaum 2, FTC Informal Staff Opinion Letter, June 22, 2001.
128. 1990 comment 604(3)(B)-1.
129. 1990 comment 604(3)(B)-3.
130. 1990 comment 604(3)(C)-1.
131. Ball, FTC Informal Staff Opinion Letter, March 1, 2000.
132. 1990 comment 604(3)(C)-2; Greathouse, FTC Informal Staff Opinion Letter, Oct. 29, 1998.
133. 1990 comment 604(3)(D)-1.
134. 1990 comment 604(3)(D)-3.
135. Greathouse, FTC Informal Staff Opinion Letter, Oct. 29, 1998.
136. 1990 comment 604(3)(D)-2.
137. 1990 comment 604(3)(E)-1.
138. 1990 comment 604(3)(E)-2.
139. 1990 comment 604(3)(E)-3.
140. Greenblatt, FTC Informal Staff Opinion Letter, Oct. 27, 1998.
141. Kaiser, FTC Informal Staff Opinion Letter, July 16, 1998; Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998.
142. 1990 comment 604(3)(E)-4.
143. 1990 comment 604(3)(E)-4.
144. 1990 comment 604(3)(E)-4.
145. Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998.
146. Kaiser, FTC Informal Staff Opinion Letter, July 16, 1998; Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998.
147. Gowen, FTC Informal Staff Opinion Letter, April 29, 1999.
148. Gowen, FTC Informal Staff Opinion Letter, April 29, 1999; Benner, FTC Informal Staff Opinion Letter, April 30, 1999.
149. Baughn, FTC Informal Staff Opinion Letter, April 30, 1999.
150. Beaudette, FTC Informal Staff Opinion Letter, June 9, 1998; Slyter, FTC Informal Staff Opinion Letter, June 12, 1998.
151. Pickett, FTC Informal Staff Opinion Letter, July 10, 1998.
152. Beaudette, FTC Informal Staff Opinion Letter, June 9, 1998.
153. Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997.
154. Slyter, FTC Informal Staff Opinion Letter, June 12, 1998.
155. Beaudette, FTC Informal Staff Opinion Letter, June 9, 1998.
156. Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998.
157. Steer, FTC Informal Staff Opinion Letter, Oct. 21, 1997; Solganik, FTC Informal Staff Opinion Letter, Oct. 23, 1997; Hauxwell, FTC Informal Staff Opinion Letter, June 12, 1998.
158. Hauxwell, FTC Informal Staff Opinion Letter, June 12, 1998.
159. Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997.
160. Willner, FTC Informal Staff Opinion Letter, March 25, 1999.
161. Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997; Leathers, FTC Informal Staff Opinion Letter,

Sept. 9, 1998; Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998.

162. Brisch, FTC Informal Staff Opinion Letter, June 11, 1998; James, FTC Informal Staff Opinion Letter, Aug. 6, 1998; Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997.

163. Brisch, FTC Informal Staff Opinion Letter, June 11, 1998; Slyter, FTC Informal Staff Opinion Letter, June 12, 1998.

164. James, FTC Informal Staff Opinion Letter, Aug. 6, 1998.

165. Fischel, FTC Informal Staff Opinion Letter, Oct. 1, 1999.

166. Solganik, FTC Informal Staff Opinion Letter, Oct. 23, 1997.

167. Weisberg, FTC Informal Staff Opinion Letter, June 27, 1997; Solganik, FTC Informal Staff Opinion Letter, Oct. 23, 1997; Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997.

168. Weisberg, FTC Informal Staff Opinion Letter, June 27, 1997; Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997; Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998; Lewis, FTC Informal Staff Opinion Letter, June 11, 1998.

169. Rosen, FTC Informal Staff Opinion Letter, June 9, 1998.

170. Hahn, FTC Informal Staff Opinion Letter, July 8, 1998; Hinkle, FTC Informal Staff Opinion Letter, July 9, 1998; Willner, FTC Informal Staff Opinion Letter, March 25, 1999; Vail, FTC Informal Staff Opinion Letter, April 5, 1999.

171. Hahn, FTC Informal Staff Opinion Letter, July 8, 1998; Meisinger, FTC Informal Staff Opinion Letter, Aug. 31, 1999.

172. Leathers, FTC Informal Staff Opinion Letter, Sept. 9, 1998.

173. Coffey, FTC Informal Staff Opinion Letter, Feb. 11, 1998.

174. Rosen, FTC Informal Staff Opinion Letter, June 9, 1998.

175. Rosen, FTC Informal Staff Opinion Letter, June 9, 1998.

176. 1990 comments 605-1 and 605-2.

177. 1990 comment 605-6.

178. 1990 comment 605-4.

179. 1990 comment 605-5.

180. 1990 comment 605-7.

181. Seham, FTC Informal Staff Opinion Letter, April 17, 1998; Nadell, FTC Informal Staff Opinion Letter, Dec. 10, 1998.

182. 1990 comment 605-3.

183. 1990 comment 605(a)(1)-1.

184. 1990 comment 605(a)(1)-3.

185. Anonymous, FTC Informal Staff Opinion Letter, Nov. 5, 1999.

186. 1990 comment 605(a)(2)-1.

187. 1990 comment 605(a)(2)-2.

188. 1990 comment 605(a)(3)-1.

189. 1990 comment 605(a)(4)-1.

190. 1990 comment 605(a)(4)-2.

191. 1990 comment 605(a)(6)-1.

192. 1990 comment 605(a)(6)-2.

193. Nadell, FTC Informal Staff Opinion Letter, Dec. 10, 1998.

194. 1990 comment 605(a)(5)-2.

195. Halpern, FTC Informal Staff Opinion Letter, June 11, 1998.

196. Johnson, FTC Informal Staff Opinion Letter, Aug. 31, 1998.

197. Johnson, FTC Informal Staff Opinion Letter, Aug. 31, 1998.

198. Kosmerl, FTC Informal Staff Opinion Letter, June 4, 1999; Amason, FTC Informal Staff Opinion Letter,

Feb. 15, 2000.

199.     Amason, FTC Informal Staff Opinion Letter, Feb. 15, 2000.

200.     Amason, FTC Informal Staff Opinion Letter, Feb. 15, 2000.

201.     1990 comment 606-1.

202.     Willner, FTC Informal Staff Opinion Letter, March 25, 1999.

203.     1990 comment 606-2.

204.     Pickett, FTC Informal Staff Opinion Letter, July 10, 1998.

205.     Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997.

206.     1990 comment 606-5; Brisch, FTC Informal Staff Opinion Letter, June 11, 1998; James, FTC Informal Staff Opinion Letter, Aug. 6, 1998; Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997.

207.     1990 comment 606-6.

208.     1990 comment 606-7.

209.     Willner, FTC Informal Staff Opinion Letter, March 25, 1999.

210.     1990 comment 607-1A.

211.     1990 comment 607-1B.

212.     1990 comment 607-2A; see United States v. ChoicePoint, Inc., No. 1:06cv198 (N.D. Ga. 2006); United States v. Rental Research Services, Inc., No. 0:09-cv-00524 (D. Minn. 2009).

213.     1990 comment 607-2B.

214.     1990 comment 607-2C.

215.     1990 comment 607-2D.

216.     1990 comment 607-2E; see Settlement One Credit Corp., ACRAnet, Inc., and Fajilan and Associates, Inc., 76 Fed. Reg. 7213 (2011) (proposed consent orders).

217.     1990 comment 607-2G.

218.     Landever, FTC Informal Staff Opinion Letter, Oct. 12, 1999.

219.     Watkins, FTC Informal Staff Opinion Letter, June 24, 1999.

220.     1990 comments 607-3A and 607-3D.

221.     1990 comment 607-6.

222.     1990 comment 607-7.

223.     1990 comment 607-3F/2.

224.     1990 comment 607-3F/1.

225.     Harris, FTC Informal Staff Opinion Letter, March 22, 1999.

226.     1990 comment 607-3F/3.

227.     1990 comments 607-3F/2 and 607-F/6.

228.     Lovern, FTC Informal Staff Opinion Letter, April 24, 1998.

229.     McCorkell, FTC Informal Staff Opinion Letter, June 3, 1999.

230.     1990 comment 607-3C.

231.     See United States v. TALX Corp., No. 4:09-CV-01071 (E.D. Mo. July 9, 2009).

232.     Beaudette, FTC Informal Staff Opinion Letter, June 9, 1998.

233.     1990 comment 608-1.

234.     1990 comment 608-2.

235.     1990 comment 609-1.

236.     1990 comment 609-4.

237.     Cohan, FTC Informal Staff Opinion Letter, Aug. 1, 2000.

238.     Lee, FTC Informal Staff Opinion Letter, June 28, 1998.

239.     1990 comment 609-7.

240.     1990 comment 609-9.

241.  1990 comment 609-10.
242.  1990 comment 609-11.
243.  Cohan, FTC Informal Staff Opinion Letter, Aug. 1, 2000.
244.  Benner, FTC Informal Staff Opinion Letter, April 30, 1999.
245.  1990 comment 609-10.
246.  United States v. Equifax Credit Info. Servs., Inc., No. 1:00-CV-0087 (N.D. Ga. Jan. 13, 2000); FTC v. Experian Mktg. Solutions, Inc., No. 3-00CV0056-L (N.D. Tex. Jan. 13, 2000); United States v. Trans Union LLC, No. 00C 0253 (N.D. Ill. Jan. 13, 2000).
247.  Cohan, FTC Informal Staff Opinion Letter, June 29, 1999.
248.  1990 comment 610-2.
249.  1990 comment 610-4.
250.  1990 comment 611-1.
251.  1990 comment 611-2.
252.  1990 comment 611-5.
253.  1990 comments 611-3 and 612-3.
254.  1990 comment 611-4.
255.  1990 comment 611-6.
256.  Anonymous, FTC Informal Staff Opinion Letter, Nov. 5, 1999.
257.  1990 comment 611-11.
258.  1990 comment 611-9; see United States v. First Advantage SafeRent, Inc., No. 8:10-cv-0090-PJM (D. Md. Jan. 14, 2010).
259.  1990 comments 611-7 and 611-8.
260.  1990 comment 611-13.
261.  1990 comment 611-14.
262.  Edwards, FTC Informal Staff Opinion Letter, July 15, 1998.
263.  1990 comment 613-1.
264.  Slyter, FTC Informal Staff Opinion Letter, June 12, 1998.
265.  1990 comment 613-2.
266.  1990 comment 613-3.
267.  1990 comment 613-5.
268.  1990 comment 613-4.
269.  Allan, FTC Informal Staff Opinion Letter, May 5, 1999.
270.  Holland, FTC Informal Staff Opinion Letter, Dec. 16, 1999.
271.  Weisberg, FTC Informal Staff Opinion Letter, June 27, 1997; Solganik, FTC Informal Staff Opinion Letter, Oct. 23, 1997; Hawkey, FTC Informal Staff Opinion Letter, Dec. 18, 1997.
272.  Solganik, FTC Informal Staff Opinion Letter, Oct. 23, 1997.
273.  1990 comment 615-1.
274.  1990 comment 615-1.
275.  1990 comment 615-9.
276.  Latour, FTC Informal Staff Opinion Letter, June 28, 2001.
277.  Stinneford, FTC Informal Staff Opinion Letter, July 14, 2000.
278.  1990 comment 615-6.
279.  Schieber, FTC Informal Staff Opinion Letter, March 3, 1998; Hall, FTC Informal Staff Opinion Letter, Oct. 26, 1998.
280.  Everson, FTC Informal Staff Opinion Letter, July 28, 1998.
281.  1990 comment 615-5.
282.  1990 comment 615-11.

283. 1990 comment 615-14; Everson, FTC Informal Staff Opinion Letter, July 28, 1998.

284. 1990 comment 615-4.

285. Schieber, FTC Informal Staff Opinion Letter, March 3, 1998.

286. 1990 comment 615-13.

287. Allan, FTC Informal Staff Opinion Letter, Feb. 14, 2000.

288. 1990 comment 615-2.

289. 1990 comment 607-8.

290. Sheffield, FTC Informal Staff Opinion Letter, Nov. 10, 1998.

291. 1990 comment 615-15.

292. 1990 comment 615-16.

293. 1990 comment 615-16.

294. Riddle, FTC Informal Staff Opinion Letter, March 17, 1999.

295. 1990 comment 621-1 and 621-2.

296. Greenblatt, FTC Informal Staff Opinion Letter, Oct. 27, 1998.

297. Harris, FTC Informal Staff Opinion Letter, March 22, 1999.

298. Harvey, FTC Informal Staff Opinion Letter, Dec. 23, 1997.

299. Harvey, FTC Informal Staff Opinion Letter, Dec. 23, 1997.

300. Johnson, FTC Informal Staff Opinion Letter, Aug. 31, 1998; Kosmerl, FTC Informal Staff Opinion Letter, June 4, 1999.

301. Gillespie, FTC Informal Staff Opinion Letter, March 10, 1998.

302. Amason, FTC Informal Staff Opinion Letter, Feb. 15, 2000.

303. Gillespie, FTC Informal Staff Opinion Letter, March 10, 1998.

304. Cohan, FTC Informal Staff Opinion Letter, Aug. 1, 2000; Tabler, FTC Informal Staff Opinion Letter, Oct. 27, 1998.

305. Cohan, FTC Informal Staff Opinion Letter, Aug. 1, 2000.

EXHIBIT "D"

Case 12-5 /020, 0112/2004 /D: 6 9 9 4 1 8 7, DktEntry: 30, Page 39 of 41

# Bill Summary & Status
## 105th Congress (1997 - 1998)
## S.2561
## CRS Summary

## Item 116 of 202

**PREVIOUS | NEXT ABOUT SUMMARIES
PREVIOUS:SUMMARY | NEXT:SUMMARY
NEW SEARCH | HOME | HELP |**

⊕ Back to Bill Summary and Status

Print    Subscribe    Share/Save

**S.2561**
**Latest Title:** Consumer Reporting Employment Clarification Act of 1998
**Sponsor:** Sen Nickles, Don [OK] (introduced 10/6/1998)    Cosponsors (1)
**Latest Major Action:** Became Public Law No: 105-347 [GPO: Text, PDF]

**SUMMARY AS OF:**
10/6/1998--Introduced.

Consumer Reporting Employment Clarification Act of 1998 - Amends the Fair Credit Reporting Act to allow notice and consent requirements (regarding procurement of a consumer report for employment purposes) to be handled by oral, written, or electronic means when: (1) the consumer involved applies for certan motor carrier employment positions regulated by the Secretary of Transportation or a State transportation agency; and (2) the only interaction at that point between the applicant and the report procurer has been by such means. Allows such means to be used in those circumstances when an adverse action is taken based on the report.

(Sec. 3) Allows a consumer reporting agency to furnish such a report only if the agency meets certain requirements, including providing with the report, or having previously provided, a summary (currently, providing with the report a summary) of the consumer's rights.

(Sec. 4) Provides national security exemptions for a consumer reporting agency from requirements to disclose to a consumer: (1) the identity of each person that procured a report on that consumer; and (2) that public record information was reported that is likely to have an adverse effect on a consumer's ability to obtain employment.

(Sec. 5) Prohibits a consumer reporting agency from reporting on civil suits, civil judgments, and arrest records (currently, reporting on suits and judgments) that are more that seven years before the report or until the governing statute of limitations has expired, whichever is longer. Removes provisions prohibiting the reporting of certain criminal matters more than seven years before the report. Exempts records of criminal convictions from the general prohibition of reporting matters over seven years old.

**Stay Connected with the Library** All ways to connect »

**Find us on**

**Subscribe & Comment**

RSS & E-Mail    Blogs

**Download & Play**

Podcasts    Webcasts    iTunes U

About | Press | Site Map | Contact | Accessibility | Legal | External Link Disclaimer | USA.gov    Speech Enabled

9th Circuit Case Number(s) | 12-57246

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) Jan 27, 2014 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | /s/ Michael J. Saltz

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) |